**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AUTUMN KHASAWNEH, on behalf of G.A.L. | ) | CASE NO. 1:25-CV-02131-CEH |
| | ) | |
| | ) | JUDGE CARMEN E. HENDERSON |
| Plaintiff, | ) | UNITED STATES MAGISTRATE JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant, | ) | |
| | ) | |

## I. Introduction

Plaintiff, Autumn Khasawneh, on behalf of her minor child G.A.L. ("Khasawneh" or "Plaintiff"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 21). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## II. Procedural History

On May 23, 2023, Claimant filed applications for SSI on behalf of her minor child G.A.L., alleging a disability onset date of July 1, 2020 and claiming she was disabled.  (ECF No. 9, PageID #: 244-47).  The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ").  (ECF No. 9, PageID #: 185).  On October 23, 2024, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified.  (ECF No. 9, PageID #: 74-92).  On October 31, 2024, the ALJ issued a written decision finding Claimant was not disabled.  (ECF No. 9, PageID #: 47-68).

1

The ALJ's decision became final on August 13, 2025, when the Appeals Council declined further review.  (ECF No. 9, PageID #: 29-31).

On October 7, 2025, Claimant filed her Complaint to challenge the Commissioner's final decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 11, 12). Claimant asserts the following assignments of error:

(1)  The ALJ failed to properly evaluate functional equivalence in finding "no limitation" in attending and completing tasks and "less than marked" limitation in caring for oneself.

(2)  The ALJ's rejection of the opinions of Dr. Bouchard and Dr. Konieczny is not supported by or consistent with the evidence of record.

(ECF No. 11).

### III. Background

#### A.  Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

Limitations have been alleged on the claimant's behalf due to difficulty with regulating her emotions, getting along with others, and understanding, remembering, and applying information. The claimant's mother reported that the claimant cannot read or understand simple sentences or stories in books and magazines; she cannot write in longhand or spell most three to four-letter words; and she cannot tell time. Her mother reported that the claimant struggles academically, and she is concerned that the claimant has dyslexia. The claimant does not finish what she starts or complete homework. Her mother reported that the claimant has difficulty hearing, and she struggles to speak in a regular tone of voice and tactfully. She states that the claimant's affect is "over the top"; and she has social emotional issues with peers, family, and teachers. She reported that the claimant does not have friends her own age, she has difficulty making new friends, she does not generally get along with adults, and she does not play team sports. She can be argumentative with other adults, including her mother. Her mother testified that the claimant was assaulted three times last year because of the claimant's difficulty interacting with others. She does not help around the house, do what she is told most of the time, obey safety rules, or accept criticism or correction. She also reported the claimant has issues with truancy/absences from school due to anxiety and PTSD; the claimant claims she has a headache or stomachache to avoid school. Her mother also testified that the claimant has threatened self-harm or has engaged in self-injuring behavior (e.g., running a brush over her skin to leave

2

marks; striking her own head). The claimant's mother also reported that the claimant gets triggered and has flashbacks; they are working on cognitive behavioral therapy before trying prescription medication. She testified that she uses respite care every six months, and she has done so since the claimant was born; she testified that she does this because of a combination of her own health issues, a previous need to care for other older children (though those children are no longer in her custody), and overwhelm with the claimant.

However, the claimant's mother also reported that the claimant has no problems seeing or communicating. She has no limitations in her physical abilities. She can read capital and small letters and simple words; she can print her name and some letters; she can write a simple story with six to seven sentences; she can add and subtract numbers over 10; she knows the days of the week and months of the year; and she understands money. Her mother testified that the claimant can perform self-care (e.g., bathing, brushing her teeth) and does not have any problems doing so. The claimant can keep busy on her own, work on arts and crafts projects, and complete chores most of the time. She generally gets along with her teachers. She can use zippers and button her clothes by herself; she can choose her own clothing; she can eat by herself with utensils; and she can pick up and put away toys.

(ECF No. 9, PageID #: 51-52) (internal citations omitted).

## B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

In November of 2020, when the claimant was using virtual learning from school, her mother reported that the claimant was having academic difficulty and mood swings. At a consultation the following month, the claimant's mother reported homeschooling the claimant with no particular curriculum, and the claimant had difficulty staying on task to get online work done. Her mother also reported that the claimant had limited interactions with peers that year due to COVID. The claimant was assessed with learning difficulties and behavior concerns; her provider encouraged counseling and provided academic resources. The claimant had some improvement in academics in February of 2021, but she still needed support to stay on task and complete tasks. Her mother reported that the claimant was enrolled in school and doing well in August of 2021. In October of 2021, the claimant reported feeling anxious and stressed regarding bullying. At a pediatric psychological consult, the claimant presented with a euthymic mood; she was open and engaged; and her speech was unremarkable. Toward the end of the visit, the claimant appeared silly and somewhat inattentive and asked if it was time to go. She was recommended for ongoing therapy.

In March of 2022, the claimant underwent a neuropsychological assessment. During testing, she was engaged and cooperative; her speech was unremarkable; her responses demonstrated clear thought content and process; she had some

difficulty sustaining attention and sometimes asked how many items were left on a particular task, but she benefitted from encouragement and redirection; and her affect fluctuated (anxious during unfamiliar tasks; decreased mood during emotional and behavioral functioning measures). Her intelligence testing showed deficits in working memory and reasoning abilities, but intact cognitive abilities. Her achievement testing showed below average performance in reading; she became easily discouraged on math problems she did not know, but her math and writing skills were otherwise age-appropriate; and although her verbal comprehension was intact, she had lower phonemic awareness than expected for her age. Intelligence testing from the assessment showed a full scale IQ of 80 (low average), some deficits in adaptive functioning (specifically functional academics, health and safety, and self-care); but no significant deficits in attention inhibition, or executive functioning She was assessed with a specific learning disorder (dyslexia) and PTSD.

The claimant also underwent a behavioral health assessment at the end of April of 2022. The claimant's mother reported that the claimant was struggling at home and in school after they moved homes and school districts. The history given to the provider included that the claimant had been in online school during COVID, and the claimant's custody and living arrangement had fluctuated between 2016 and 2020, during which time the claimant's mother believed the claimant had traumatic experiences. The assessment was based entirely on the reports from the claimant's mother; no mental status examination was performed. The claimant was assessed with PTSD.

Her counseling records show some remarkable findings as to mood, affect, and judgment, but in large part, the examinations were otherwise unremarkable. The claimant experienced a flashback during school in May of 2022; the record indicates that the claimant asked a teacher for help, and her guidance counselor got the claimant in touch with her counselor, who held a session. The claimant was able to identify what she could do to deescalate when she experiences a flashback. During the examination, the claimant's mood was nervous and anxious, but she was otherwise relaxed and engaged, and her insight and judgment were appropriate. A few weeks later, she reported not having flashbacks or uncomfortable emotions; her mood was happy, and her examination was otherwise unremarkable. Her examination in June was similar. She reported some feelings of upset from peers and negative thinking in July, but her examination was unremarkable. Her examinations in August were unremarkable, as well; she reported some stressors, but she also reported having good days at school and having a friend at school. She was nervous and anxious about moving stress at the end of the month, and she was irritable regarding class peers, both in August and in September of 2022. She also reported learning difficulties and academic challenges in October of 2022; on examination, her mood was sad, nervous, and/or anxious, but the rest of her examinations were unremarkable. She reported thoughts of self-harm and self-harm behaviors in November of 2022; on examination, she had depressive thoughts, an anxious/depressed mood, and impaired judgment. The following month, her

4

thought content was unremarkable, but her mood was nervous, anxious, and irritable; she was pleasant and expressive with her counselor, though. She had depressive cognitions and some irritability related to peer teasing a few days later.

The claimant also received care at Providence House periodically (her mother testified to using their services for respite care; see Testimony). In the summer of 2022, the claimant was happy and playful; she played outside, watched movies, and made art projects; she slept well; and there were no "critical incidences" noted during her stay; the staff also did not have any concerns during her stay. In the fall of 2022, she was happy, content, and active. There was one altercation between the claimant and another child started when the other child was aggressive toward the claimant, but otherwise, the stay was substantially like summer; she was absent from school during this stay.

At counseling in January of 2023, the claimant was pleasant, but she presented with some anxiousness, and she was assessed with impaired judgment due to difficulty managing impulses. Her counseling sessions in February of 2023 were substantially like January. In March, she reported anxiety surrounded bullying at school, and the claimant's mother had kept the claimant out of school that week. On examination, the claimant was nervous, irritable, and anxious; she had depressive cognitions; and her judgment was impaired. Her examination in April was similar. She attended Providence House in the spring of 2023, the claimant was happy, content, and sociable; she ate and slept well; and there were no critical incident reports. The claimant did not attend school while at Providence House at this time. In September of 2023, the claimant reported to her counselor that she was adjusting to a new school setting and attempting to develop new friendships at school, but she also reported some difficulties with certain peers. At her examinations, she was anxious and/or nervous and sometimes impulsive, but the rest of her examinations were unremarkable.

At a consultative psychological examination in September of 2023, the claimant's mother reported that the claimant had difficulty interacting with peers; she experienced greater than average mood swings and was resistant to discipline and redirection; she had difficulty concentrating; and she experienced nightmares and flashbacks. Her mother also reported that the claimant helped with age-appropriate chores, like cleaning her room and helping with dishes, and doing simple microwave cooking. During the examination, the claimant showed no distress and separated easily from her mother; she was well-groomed; she was somewhat subdued, but pleasant and responsive; she showed no symptoms of hyperactivity, restlessness, or inattentiveness; she showed no indication of any diminished tolerance for frustration; and her speech was unremarkable. Intelligence testing showed a full-scale IQ of 74, but her verbal comprehension index was 89. She was assessed with BIF, PTSD, and depressive disorder.

She reported to her counselor in October of 2023 that she requested to have her seat moved in school to better concentrate. She also reported some life stressors and

some adjustments in school; generally, she was anxious and/or nervous; her affect was either appropriate for the circumstance or labile; and her judgment was impaired. Her examination in November was similar. The claimant stayed at Providence House in early November of 2023, where staff described her as happy and content, and there were no critical incidents reported; she was absent from school during this visit. In December, she reported to her counselor that she missed a week of school that month relating to a peer conflict.

At counseling sessions in the spring of 2024, the claimant's mood was nervous and/or anxious; her affect generally was appropriate; and her judgment was impaired. However, she also had sessions where she had some worry, but her mood was neutral or happy, her behavior was cooperative, and the exam was otherwise unremarkable. At Providence House in the spring of 2024, she was described as happy and enjoying the activities. However, she had several instances in which she was verbally or physically aggressive toward peers. She also was absent from school while at Providence House.

More recently, her mental status examinations at counseling were within normal limits. She visited providence House again in August of 2024 without incident.

The undersigned notes that at physical examinations with her primary providers, the claimant's psychiatric/mental status examinations were unremarkable.

(ECF No. 9, PageID #: 52-56) (internal citations omitted).

## C. Opinion Evidence at Issue

The ALJ explained her assessment of the medical opinions at issue as follows:

The undersigned finds partially persuasive the opinion of consultative psychological examiner J. Joseph Konieczny, Ph.D., dated September 28, 2023, opining that the claimant has some limitations in acquiring and utilizing information, interacting and relating with others, and self-care; and no more than mild difficulty in attending and completing tasks (10F/4). The undersigned finds this opinion partially persuasive because it generally is supported by the consultant's examination: the claimant showed no distress and separated easily from her mother; she was well-groomed; she was somewhat subdued, but pleasant and responsive; she showed no symptoms of hyperactivity, restlessness, or inattentiveness; she showed no indication of any diminished tolerance for frustration; her speech was unremarkable; and her intelligence testing showed a full-scale IQ of 74, but her verbal comprehension index was 89. The more complete record supports that the claimant does not have any limitations in attending and completing tasks. At the examination with the consultant, she showed no symptoms of hyperactivity, restlessness, or inattentiveness (10F/2-6). In October of 2023, the claimant reported to her counselor that she requested a seat change in school to better concentrate (11F/10), and none of the records from her examinations or her

6

counseling sessions in 2023 and 2024 indicate any issues with attentiveness, either. Thus, the opinion that the claimant has even mild limitations in attending and completing tasks is not consistent with the more complete record. Otherwise, this opinion is consistent with the other evidence of record. Therefore, the opinion is persuasive.

The undersigned finds partially persuasive the opinion of the claimant's current primary pediatrician, Brian Bouchard, M.D., dated January 31, 2024, opining that the claimant has moderate limitations in acquiring and using information, caring for oneself, and health and physical well-being; she has marked limitations in attending and completing tasks and in interacting and relating with others; and she has no limitations in moving about and manipulating objects (18F/3-6). The undersigned finds this opinion partially persuasive because his opinions regarding the claimant's acquiring and using information, caring for oneself, and moving about and manipulating objects are both supported by the doctor's examinations of the claimant, and they are consistent with the other evidence of record. However, his opinions as to attending and completing tasks, interacting and relating with others, and health and physical well-being are neither supported by his own examinations (e.g., unremarkable mental status exam at 2F/11-13 (02/09/23), nor are they consistent with the more complete record. As noted above, as to attending and completing tasks, she showed no symptoms of hyperactivity, restlessness, or inattentiveness at her consultative examination (10F/2-6), she reported taking affirmative steps to better concentrate in school (11F/10), and none of the records from her examinations or her counseling sessions in 2023 and 2024 indicate any issues with attentiveness. For interacting and relating with others, none of Dr. Bouchard's examinations indicate that the claimant had any difficulty interacting with him; rather, his opinion appears to be based solely on reports from the claimant's mother. As set forth in this decision, while the record supports some limitations in this domain of functioning (e.g., counseling sessions where her mood was anxious and/or nervous; reports of some peer conflicts at counseling and at Providence House (e.g., 19F/9-10 and 28F/7-9, respectively); and teacher reports of some difficulty responding to criticism and socializing with peers (17F)), the record also supports that the claimant interacted well with peers at school more recently (e.g., ETR observations at 20F/30-66; no noted difficulty interacting with counselor or physicians). Finally, as to health and physical well-being, the record does not support any limitations. Dr. Bouchard's opinion is based on the claimant's mental health and obesity. As discussed above, the claimant's obesity is non-severe. While the record contains allegations of somatic complaints related to the claimant's anxiety, there are not objective medical findings to support them; and the record does not contain evidence of other limitations that impact this domain (e.g., chronic medication side effects; need for intensive medical care as a result of being medically fragile; periodic exacerbations of impairments). Because these opinions are not consistent with the record, but the balance of the opinion is both supported and consistent as discussed above, the opinion is partially persuasive.

(ECF No. 9, PageID #: 60-61).

**IV.    The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

1.  The claimant was born in May 2013. Therefore, she was a school-age child on May 3, 2023, the date application was filed, and is currently an adolescent.

3.  The claimant has the following severe impairments: post-traumatic stress disorder (PTSD); borderline intellectual functioning (BIF); and depressive disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6.  The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since May 3, 2023, the date the application was filed.

(ECF No. 9, PageID #: 48-68).

**V. Law & Analysis**

**A.  Standard of Review**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott*

*v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

An individual under the age of eighteen is considered disabled if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 1382c(a)(3)(A). The regulations provide a three-step process for evaluating a child's disability claim. 20 C.F.R. § 416.924(a). First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). Second, the ALJ must establish whether a claimant has a severe medically determinable impairment. 20 C.F.R. § 416.924(d). Third, the ALJ must consider whether the claimant has an impairment or combination of impairments that meets or medically equals the listings. 20 C.F.R. § 416.924(d). If a severe impairment does not meet or medically equal any listing, the ALJ must decide whether it results in limitations that functionally equal the listings. 20 C.F.R. § 416.926a.

In determining whether an impairment or combination of impairments functionally equals the listings, the ALJ assesses the claimant's functioning in terms of six domains: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Self; and 6) Health and Physical Well-Being. 20 C.F.R. § 416.926a. In making this assessment, the ALJ compares how the claimant performs with children who do not have an impairment. 20 C.F.R. § 416.924a(b). To functionally

equal the listings, the claimant's impairment must result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). The regulations state that a "marked" limitation exists when a person's "impairment(s) interfere with [their] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" (*Id.*).

### C. Discussion

Plaintiff raises two issues on appeal. First, she asserts that ALJ failed to properly evaluate functional equivalence in finding "no limitation" in the domain of attending and completing tasks and "less than marked" limitation in the domain of caring for oneself. (ECF Doc. 11, pp. 12-16). Next, she asserts that the ALJ's rejection of the opinions of Dr. Bouchard and Dr. Konieczny is not supported by or consistent with the evidence of record. (*Id.*, pp. 16-19).

#### 1. Evaluation of Functional Equivalence

Plaintiff first asserts that the ALJ's determination that G.A.L. has "no limitation" in the domain of Attending and Completing Tasks and only "less than marked" limitations in the domains of Acquiring and Using Information, Interacting and Relating with Others, and Caring for Yourself is not supported by substantial evidence. (ECF Doc. 11, p. 12). She asserts that the ALJ erred by considering G.A.L.'s inability to consistently attend and function in school only in the domain of Acquiring and Using Information, when it was in fact relevant to multiple domains. (*Id.*) She also asserts the ALJ erred by selectively relying on normal findings while ignoring materially inconsistent evidence demonstrating serious interference with functioning in these domains. (*Id.*)

The Commissioner responds that the ALJ's determinations are supported by substantial evidence and the Plaintiff's assertions to the contrary seek to have this court impermissibly re-weigh the evidence. (ECF Doc 12, pp. 6-8.) The Commissioner does not address the argument that

10

the ALJ omitted relevant evidence from her assessment of these domains, but rather asserts that the evidence she cited was sufficient to provide substantial evidence in support of her determination.

When making disability determinations, the ALJ must compare the whole child's functioning in all activities at home, school, and in their community to children of the same age without impairments. 20 C.F.R. § 416.91a(b). The ALJ must consider all relevant evidence in the record when determining whether the claimant is disabled. 20 C.F.R. § 416.924(a). But the ALJ need not directly address in the written decision every piece of evidence before her. *See Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 508 (6th Cir. 2006) (citation omitted). However, by regulation, the ALJ must evaluate a child's impairment-related limitations in *any* affected domain. 20 C.F.R. § 416.926a(c) (emphasis added).

### a. G.A.L.'s Absences

It is undisputed that G.A.L. was frequently absent from school during the relevant period. School records show that G.A.L. missed 23 of 96 days in the 2021-2022 school year.[1] The ALJ noted there were various reasons for these absences: sometimes, G.A.L was absent because she was staying at Providence House, a residential facility, and other times her mother called in the absences. (*Id.*) Plaintiff asserts that the ALJ failed to consider whether G.A.L.'s impairments were contributing factors to these frequent absences. However, the record does not demonstrate that these absences were caused by G.A.L.'s mental health impairments. As the ALJ noted, Plaintiff testified that G.A.L.'s visits to Providence House for respite care were to give G.A.L.'s mother the ability to get care for her own medical needs and to care for her other children and herself. (ECF Doc. 9, PageID #: 55, citing PageID #: 54-56). These absences total approximately 5 days of each

---

[1] This reflects her attendance in the Wickliffe City School District, where G.A.L. enrolled in December 2021. (ECF Doc. 9, PageID #: 923).

academic semester. (*see, e.g.,* ECF Doc 9, PageID #: 601 (05/27/22-06/01/22); Page ID #: 605 (10/27/22-11/1/22); Page ID #: 609, 1298 (04/20/23-04/25/23); PageID #: 1301 (11/02/23-11/07/23) PageID #: 1304 (3/08/24-3/15/24)). During these visits, she reportedly "transitioned well" and was described as "happy and playful" and "content and sociable" by staff, although there were a few instances of peer conflict. (*Id.* at PageID #: 601, 606, 609, 1301, 1304). The other absences – which account for a significant majority of the time she missed - appear to have been called in by her mother. During most of these absences, it appears G.A.L. was home and not receiving any additional medical or mental health intervention.

Plaintiff's argument is that these absences result from symptoms of G.A.L's disability, and were relevant to all the domains assessed by the ALJ, who only referenced the absences in her explanation of domain of Acquiring and Using Information. (ECF Doc. 11, p. 12). However, despite Plaintiff's assertion that the record shows G.A.L.'s absences are the result of trauma symptoms and anxiety, the records she cites in support of this are not clear-cut.  She cites the following:

- An October 7, 2021 MetroHealth MyChart message from G.A.L.'s mother to her primary care physician stated that her mother was keeping [G.A.L.] home from school an average of one day a week "due to personal problems she is facing at school," including bullying. (ECF Doc. 9, PageID #: 561). Her mother reported that G.A.L. "says she wants to die and everyone hates her, has extreme distress and anxiety" and expressed concern that G.A.L. could not "focus on learning" while being "traumatized and abused." (*Id.*)

- A MetroHealth treatment note from October 8, 2021 states that G.A.L. was evaluated by pediatric psychology primary care based on her mother's report that she since returning to school in person, G.A.L. was experiencing bullying by peers and conflict with her teacher. (ECF Doc. 9, PageID #: 565). At the examination, she presented with "a euthymic mood, she was open and engaged and spoke in a normal rhythm, rate, and tone and had fair insight. Towards the end of the visit she appeared silly and somewhat inattentive and was asking if it was time to go. No abnormal thought processes noted." (*Id.* at PageID #: 566). The evaluating psychologist assessed "mood concerns, irritability, sadness, low self-esteem, which appears to be exacerbated by bullying at school." She recommended that, "[t]he

12

family would likely benefit from support in advocating for help at school with bullying, and [G.A.L.] would likely benefit from ongoing therapy to address mood and self-esteem concerns." (*Id*.)

- A Pediatric Neurology new patient visit on March 24, 2023 note states that G.A.L had tension headaches once ever 1 to 3 weeks. (ECF Doc. 9, PageID #: 655). Notes indicated that G.A.L. reported that her moods were "good" and counseling was helpful. (*Id*. at PageID #: 654). On examination, her mental status was normal. (*Id*. at PageID #: 655). The examining neurologist opined that "I suspect anxiety/PTSD as well as lifestyle factors are contributing to [G.A.L.'s] headaches at this time," and recommended the headaches be treated with ibuprofen and acetaminophen, as well as placing a referral for anxiety/mood, PTSD, and bullying concerns. (*Id*. at PageID #: 655).

- At the October 23, 2024 hearing, her mother testified that G.A.L. missed substantial school days due "varied reasons," including headaches and stomach aches, flashbacks to prior abuse, and the school's failure to provide her needed accommodations, such as a non-verbal cue for when she was triggered and the opportunity to check-in with a trusted adult. (ECF Doc. 9, PageID #: 84-85). Her mother testified "she knows how to get herself back, and thankfully, she's self-aware." (*Id*.)  She testified that G.A.L. had "developed a phobia of going to school" and sometimes refused to go due to assaults at school and the way kids would gang up to pick on her. (*Id*. at PageID #: 85-86.)

- An Initial Evaluation Team Report completed in January 8, 2024 by Wickliffe City School District noted that G.A.L.'s "attendance has impacted the team's ability to provide consistent, proactive skill building" with regard to coping skills and social problem solving skills. (ECF Doc. 9, PageID #: 914-15). The ETR notes that, after experiencing "social conflicts and bullying from peers," G.A.L. refused to attend school beginning in March 2023, ultimately missing 65 days of school. She finished her fourth grade year completing work at home. (*Id*. at PageID #: 923.) She returned in person for fifth grade, but was absent 22 days from August through November 13, "including 2 days Out of School Suspension in September 2023, as she was involved in physical altercation with peer in the bathroom," and absent 10 days from November 14 to January 5, while attending on an adjusted half day schedule. (*Id*.)

In explaining her determination that G.A.L. had "less than Marked limitations" in the domain of Acquiring and Using Information, the ALJ noted "[d]uring the 2022-2023 school year, the claimant had over 55 absences. The claimant's 2023-2024 school records indicate that she had at least 45 full-day absences." (ECF Doc. 9, PageID #: 63). The ALJ identifies these absences as a contributing factor to G.A.L.'s challenges in the domain of Acquiring and Using Information,

and Plaintiff does not challenge her assessment of this domain. (*Id*.)

### b.  Limitations in Attending and Completing Tasks

First, Plaintiff asserts that the ALJ erred in assessing that G.A.L. had no limitation in the domain of Attending and Completing Tasks. (ECF Doc. 11, p. 12).  She argues that "[t]he record shows that G.L.'s impairments manifest most dramatically in her inability to consistently attend and function in school; yet, the ALJ evaluated G.L.'s chronic absenteeism in the wrong domain." (*Id*.) She asserts that G.A.L.'s absences show "shows she cannot consistently attend school, tolerate the environment, regulate her emotions, and persist through ordinary demands." (ECF Doc. 11, at p. 12). She also links G.A.L.'s absences directly to her impairment of PTSD, stating "[a] child who repeatedly cannot remain in the school environment due to PTSD symptoms is demonstrating interference" in the domain of Attending and Completing Tasks. (*Id*. at pp. 12-13).

Social Security regulations explain that the domain of attending and completing tasks considers a school-age child's ability to focus their attention, follow directions, complete schoolwork, organize school materials, avoid careless mistakes, and complete family chores. 20 C.F.R. § 416.926a(h)(2)(iv); *see also Williams-Dorsey v. Comm'r of Soc. Sec.*, 2024 WL 345035 at *6 (N.D. Ohio, July 18, 2024).

Plaintiff's assertion that the ALJ failed to consider G.A.L.'s absences in assessing her functioning in this domain is inaccurate.  The ALJ's decision notes that G.A.L.'s mother "reported the claimant has issues with truancy/absences from school due to anxiety and PTSD; the claimant claims she has a headache or stomachache to avoid school. The claimant's mother also reported that the claimant gets triggered and has flashbacks." (ECF Doc. 9, PageID #: 63-64). This is precisely the evidence that Plaintiff asserts she overlooked. Further, Plaintiff fails to identify any record evidence connecting G.A.L.'s absences with the functional abilities in this domain. In fact,

14

during some of her absences, G.A.L. continued to complete schoolwork when homework packets were provided by her teachers. (*See, e.g., Id*. at PageID #: 606-07). Notes from her residential care at Providence House in November 2023 state that she "especially liked reading books, completing puzzles, playing board games, [and] completing arts and crafts projects with beads and foam," among other activities. (*Id*. at PageID #: 1301). In March 2024, staff at Providence House again noted that she "enjoyed … working on puzzles," among other activities. (*Id*. at PageID #: 1304). Thus, it is hard to see how Plaintiff expects the ALJ to have made a causal connection between G.A.L.'s frequent absences from school and her ability to focus her attention, follow directions, and even complete schoolwork when the opportunity was offered to her.

In contrast, the ALJ cited specific evidence from across the relevant period in supporting her finding that G.A.L. had no limitation in the domain of Attending and Completing Tasks.  After noting Plaintiff's concerns about G.A.L.'s absences and her inability to "finish what she starts or complete homework," the ALJ noted that Plaintiff also testified that G.A.L. could "keep busy on her own, work on arts and crafts projects, and complete chores most of the time." (ECF Doc. 9, PageID #: 63-64). This was consistent with classroom observation records stating G.A.L. could "follow along with the classroom activity, she initiated and completed her assignment, and she cleaned up after herself; she did not exhibit difficulty in this domain." (*Id*. at PageID #: 64). It was also consistent with medical records from G.A.L.'s therapy providers, showing that G.A.L. was "attentive" during counseling sessions, and actively advocated to move her seat away from other students to allow her "to better concentrate on her schoolwork." (*Id*. at PageID #: 723, 725).

### c.  Limitations in Interacting and Relating with Others

Towards the end of her argument regarding the domain of Attending and Completing Tasks, Plaintiff asserts that the ALJ also erred in assessing that G.A.L. had a less than marked

limitation in the domain of Interacting and Relating to Others. (ECF Doc. 11, p. 14). She notes that records show that G.A.L was suspended after a verbal exchange escalated into a physical altercation with "pushing, shoving, hair pulling, punching" and which required medical treatment, as well as her mother's testimony and other school records regarding ongoing challenges with peers and teachers. (*Id.,* citing ECF Doc. 9, PageID #: 846, 694).

In the domain of Interacting and Relating to Others, the regulations provide that children should be able to effectively communicate with others through expressions, gestures, and actions in different contexts throughout the day. SSR 09-5p, 2009 WL 396026 (S.S.A. Feb 17, 2009). The child should also "be able to form relationships with family members, friends, and others, and to sustain those relationships over time in an age-appropriate manner." *Id*. The issue is not whether there is any limitation in this domain, but whether the degree of limitation is "marked" (meaning more than moderate).

In explaining her determination that G.A.L. had "less than marked" impairment in this domain, the ALJ addressed her mother's testimony and school records indicating that G.A.L. "has social emotional issues with peers, family, and teachers …. does not have friends her own age, she has difficulty making new friends, …. [and] can be argumentative with other adults, including her mother." (ECF Doc. 9, PageID #: 65). The ALJ also noted the testimony that G.A.L. was assaulted 3 times in the past year due to her difficulty interacting with others. (*Id*.) The ALJ did not overlook or omit this evidence of physical conflict. However, the ALJ explained that her determination of the severity of G.A.L.'s limitation in this area was influenced by other evidence, including her mother's testimony that G.A.L. "generally got along with her teachers," and education records indicating that while G.A.L. sometimes snapped at other students who criticized her, at other times she was greeted by peers, interacted with them in helpful ways, and was able to "keep up" in

16

"sports, games, and other extracurricular activities." (*Id*.)  She noted that the record supported the conclusion that some of G.A.L.'s " difficulty interacting with others" was impacted by virtual learning, homeschooling, or other settings where the claimant was without access to peers, including "her absences," which are again enumerated in the analysis of this domain. (*Id*.) Further, educational and counseling records, as well as the consultative psychological examiner's report, supported the finding that G.A.L. was able to form friendships and relationships with peers and felt more comfortable in the school environment with time. (*Id*. at PageID #: 402, 712, 734). Thus, the ALJ explicitly considered most of the evidence that the Plaintiff asserts she overlooked, omitted, or failed to apply to this domain.

### d.  Limitations in Caring for Self

Finally, Plaintiff asserts that the ALJ erred in determining that G.A.L. had a "less than marked" limitation in the domain of Caring for Self. (ECF Doc. 11, p. 15).  She asserts that the ALJ "reduces the domain to basic hygiene while minimizing evidence of significantly impaired emotional regulation." (*Id*.) She asserts that the ALJ overlooked evidence of self-harm, depressive thoughts, and impaired judgment with impulsivity, and failed to examine evidence that G.A.L. "required multiple respite placements," and a 504 evaluation noted substantial impairment in mood regulation. (*Id*.)

The domain of Caring for Self considers how well a child maintains a healthy emotional and physical state. 20 C.F.R. § 416.926a(k); Social Security Ruling 09–7p. School age children in this domain should be independent in my daily activities such as dressing and bathing, although they may still sometimes need to be reminded to do these activates routinely. *Id*. They should begin to recognize that they are competent in doing some activities and that they have difficulty with others. *Id*. They should be able to identify circumstances where they feel good about themselves

and when they feel bad, and begin to develop understanding of what is right and wrong and what is acceptable and unacceptable behavior. *Id*. Furthermore, they should begin to demonstrate consistent control over their behavior, and should be able to avoid behaviors that are unsafe or otherwise not good for them as well as beginning to imitate more of the behavior of adults they know. *Id*.

In assessing G.A.L's ability to care for herself, the ALJ notes the record is "not entirely consistent with allegations of disabling mental functional limitations." (ECF Doc. 9, PageID# 58). She noted that both school records and her mother's testimony support the finding that G.A.L. had good hygiene and did not have any problems performing self-care activities like brushing her teeth, bathing, choosing her clothing, dressing herself, eating, and cleaning up her toys. (*Id*. at PageID# 66). However, the ALJ's analysis does not stop here – she also cites some of the same records highlighted by Plaintiff and notes that educational records show minimal disciplinary incidents and support the finding that G.A.L. had challenges with managing her emotions, and responding to changes in routine and criticism, but also was able to manage her anxiety and moods once she entered the classroom, and was observed interacting "well" with others, cleaning up after herself, and helping peers. (*Id*. at 66-67). She cited G.A.L.'s neuropsychological assessment and counseling records, explaining how they support a finding of "some limitation in this domain," but also show significant strengths, such as the ability to ask for help from a teacher during a PTSD flashback, and identify what she could do to deescalate that situation, as well as requesting that her seat be moved so that she could concentrate better in class. (*Id*. at PageID #: 67, citing Page ID #: 401-01, 725). Further, as the ALJ explains, her determination is consistent with the opinions

of G.A.L.'s pediatrician, the consultative psychological examiner,[2] and the state agency psychological consultants. (*Id*. at PageID #: 67, citing Page ID #: 712, 870-71, 160, 166-67).

It is true that the ALJ does not discuss G.A.L.'s periods of residential care in this domain, but Plaintiff fails to articulate a clear reason why she should have done so. Records from Providence House indicate that G.A.L.'s mother sought respite care so that G.A.L.'s mother "could decompress and take time to think about employment and resources available to her" because she was "an overwhelmed parent." (*Id*. at PageID #: 601, 609, 1301). G.A.L. consistently transitioned well to this change in environment, and staff regularly noted no behavior concerns. (*Id*. at PageID #: 601, 606, 609, 1301).

The ALJ discusses some of G.A.L.'s absences in reviewing the evidence relevant to self-care, explaining "[t]he claimant's ETR indicates that the claimant had difficulty managing her emotions and to address the claimant's anxiety, she was permitted to attend school for half-days for a time; however, the claimant wanted to return to a full-day schedule (20F/30-66 (01/08/24))." (*Id*. at PageID #: 58-59).  She also notes that G.A.L.'s IEP accommodations included services on coping strategies and "breaks as requested," but does not refence any documentation regarding how frequently G.A.L. needed to use these accommodations. (*Id*. at PageID #: 59).

With regard to the ALJ's analysis of all the functional domains challenged by Plaintiff, there is a difference of interpretation regarding whether G.A.L.'s impairments directly caused her absences, or whether a complex mix of internal and external factors led to G.A.L.'s frequent

---

[2] Plaintiff asserts that the ALJ's determination conflicts with the consultative examiner's opinion that G.A.L. would have "inconsistent task completion during PTSD episodes." (ECF Doc. 11 at p. 16). However, the consultative examiner raised this issue in the domain of attending and completing tasks, where he also opined that, except during flashbacks, she would have only "mild" difficulty. (ECF Doc. 9, Page ID #: 712). With regard to self care, he opined that "As a result of her intellectual limitations and mood symptoms, G.A.L. would have diminished tolerance for frustration and diminished coping skills which would impact her capabilities in some of these areas," while also noting that "[d]uring the course of the evaluation, she showed no indication of any diminished tolerance for frustration." (*Id*. at Page ID #: 711-12).

absences from school. On this issue, reasonable minds could reach different conclusions, but this Court cannot substitute its own judgment for that of the ALJ. As stated above, this court's review is limited to determining whether substantial evidence supports the ALJ's finding that these domains were not markedly limited. *See Blakley*, 581 F.3d at 406 ("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decision makers can go either way."). Even where Plaintiff has identified evidence that supports an alternative finding, the Court will not disturb the Commissioner's decision so long as substantial evidence also supports the conclusion the ALJ reached. *O'Brien v. Commissioner of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). Under this standard, the Court cannot reweigh the evidence or substitute its judgment for that of the ALJ. *Joni W. v. Comm'r of Soc. Sec.*, No. 2:23-CV-2505, 2024 WL 488044, at *7 (S.D. Ohio Feb. 8, 2024). Here, the ALJ's findings are supported by substantial evidence within her "zone of choice." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). Plaintiff has not identified any significant evidence overlooked or omitted by the ALJ. Accordingly, the ALJ's determination of functional equivalence must be upheld.

### 2.  Evaluation of Medical Opinions

Plaintiff's second assignment of error asserts that the ALJ erred in rejecting the marked limitations assessed by treating pediatrician Dr. Bouchard and in characterizing the opinion of consultative examiner Dr. Konieczny. (ECF Doc. 11 at p. 16, 19). She argues that the ALJ improperly dismissed the opinions by mischaracterizing the basis of the opinion or selectively citing normal findings while ignoring consistent, contradictory evidence. (*Id*.)

Social Security Regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Nevertheless, an ALJ must

"articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s) but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c), 404. 1520c(b)(2) ("The factors of supportability [ ] and consistency [ ] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . . ").

### a.  Opinion of Dr. Bouchard

Dr. Bouchard, G.A.L.'s pediatrician, opined in January 2024, that G.A.L. had moderate limitations in acquiring and using information, caring for oneself, and health and physical well-being; marked limitations in attending and completing tasks and in interacting and relating with others; and no limitations in moving about and manipulating objects. (ECF Doc. 9 at Page ID #: 868-71). The ALJ found Dr. Bouchard's opinion partially persuasive, noting that "his opinions regarding the claimant's acquiring and using information, caring for oneself, and moving about and manipulating objects are both supported by the doctor's examinations of the claimant, and they are consistent with the other evidence of record." (*Id*. at PageID #: 60). She found his opinions regarding attending and completing tasks, interacting and relating with others, and health and physical well-being were neither supported by his own examinations nor consistent with the "more complete record." (*Id*. at PageID #: 60-61).  This analysis will focus on the first two disputed areas of the opinion, because even if the ALJ had adopted Dr. Bouchard's opinion that G.A.L. had

21

moderate (less than marked) limitations in the area of health and physical well-being, this would not have affected the outcome of the disability determination.

Plaintiff asserts that the ALJ's explanation fails for two reasons: first, because she "improperly equated 'supportability' with the presence of abnormal mental status findings during brief office visits," and second, because her determination that a portion of his opinion was inconsistent with the record is, itself, inconsistent with that record. (ECF Doc. 11 at 17-18). Neither of these assertions withstands scrutiny.

As noted by the Commissioner, the regulations state that "The more relevant the objective evidence and supporting explanations presented by a medical source to support his or her medical opinions … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Here, Dr. Bouchard's opinion does not identify any objective evidence he used to support it, and his explanations are brief and somewhat vague. (ECF Doc. 9 at PageID #: 868-71). Both the Commissioner and the ALJ noted that none of Dr. Bouchard's treatment notes indicate that G.A.L. had any difficulty interacting with him, and Plaintiff does not identify any specific notes that they either overlooked or omitted. (ECF Doc. 12 at p. 9, citing ECF Doc. 9 at PageID #: 60-61). It is undisputed that Dr. Bouchard did not note abnormal mental status findings during his examinations or treatment of G.A.L. He offers no explanation at all for the opinion that G.A.L. had "marked limitation" in attending and completing tasks. (*Id*. at PageID #: 869). His explanation for the opinion that G.A.L. had marked limitation in interacting and relating with others is a note that she had "[f]requent behavior concerns at school related to interactions with peers," and was "extremely sensitive to any comments or criticisms." (*Id*.) There is no indication that Dr. Bouchard had access to school records, however. As discussed *supra*, disciplinary issues at school were infrequent. (ECF Doc. 9 at PageID #: 952). He later responded to a question about school attendance by stating

that G.A.L. "had many problems with school attendance due to behavior but also disputes over IEP application and instances of bullying." (ECF Doc. 9 at PageID #: 870). It is again unclear what "behavior" Dr. Bouchard is referencing – and whether he intended to attribute that behavior to G.A.L., her peers, or adults. The ALJ also specifically noted a February 2023 examination of G.A.L. where Dr. Bouchard did not identify any mental abnormalities, although he did recommend that she continue with "routine counseling" for mental health and noted she had an IEP in place at school. (ECF Doc. 9 at PageID #: 67, citing PageID #: 372-74). Further the ALJ notes that at many appointments with other primary care providers, "the claimant's psychiatric/mental status examinations were unremarkable." (*Id.*, citing PageID #: 598 (08/31/20); 584 (02/08/21); 577 (08/30/21); 558 (10/25/21); 537 (10/28/22); 533 (04/21/23); 1008 (11/06/23); 1003 (03/11/24)).

In contrast, Plaintiff supports her assertion that Dr. Bouchard based his opinion on "longitudinal treatment, parental reports, school-based functioning, and the pattern of exacerbations documented throughout the record" with a citation to the opinion itself, which does not identify any evidence underlying his findings. (ECF Doc. 11 at p. 17). She makes the broad observation that "[p]ediatric primary care often involves integrating school records, behavioral reports, and caregiver observations," but fails to show that this was relevant to Dr. Bouchard's opinion. (*Id.*) She asserts that educational records support Dr. Bouchard's opinion, but there is no evidence that he had access to any of G.A.L.'s academic records, as he does not reference them. (*Id.* at p. 18). Further, the educational record she cited is the initial referral for evaluation completed by school staff in late 2023. (*Id.*, citing ECF Doc. 9 at PageID #: 886-87).

In analyzing Dr. Bouchard's opinion, the ALJ addressed the elements of supportability and consistency by identifying records from Dr. Bouchard's treatment of G.A.L. and the record as a whole which she found inconsistent with his conclusions. This is not error. *Creter v. Saul*, No.

1:20-cv-0840, 2021 WL 809323 at *11 (N.D. Ohio 2021) (Finding the ALJ did not err because he "specifically cited treatment records he felt were inconsistent with [the expert opinion], and explained why.") In contrast, Plaintiff cites other records – also addressed by the ALJ – that could lead to a different conclusion. However, it is not the role of this Court "to reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). Therefore, the ALJ's determination must be upheld.

### b. Opinion of Dr. Konieczny

Finally, Plaintiff challenges the ALJ's characterization of the opinion of consultative psychological examiner Dr. Konieczny. (ECF Doc. 11 at p. 19). The ALJ found this opinion "partially persuasive" (ECF Doc. 9 at PageID #: 60). The portion of the explanation that Plaintiff asserts mischaracterized Dr. Konieczny's opinion states that G.A.L. had "no more than mild difficulty in attending and completing tasks." (*Id*.) This is also the only part of the opinion that the ALJ did not find persuasive, as she found "the opinion that the claimant has even mild limitations in attending and completing tasks is not consistent with the more complete record." (*Id*.)

The section of Dr. Konieczny's opinion relating to the domain of attending and completing tasks states:

> As a result of her PTSD, G.A.L.'s abilities in these areas would be somewhat sporadic and inconsistent. When she is having recurring thoughts or flashbacks, she would have difficulty maintaining focus on even simple multi-step tasks. She otherwise would have a mild degree of difficulty in this area due to her intellectual limitations.

(*Id*. at PageID #: 712). Thus, Plaintiff is correct that the ALJ's statement that Dr. Konieczny opined G.A.L. had "no more than mild difficulty in attending and completing tasks" is inaccurate – his

24

opinion clearly implies that on those occasions when she was having PTSD flashbacks, her limitations in this area would be *more* than mild. Further, the Commissioner fails to address this issue in his brief, despite the fact it is identified in a subheading and was discussed with specificity on the final page of Plaintiff's brief.[3] (ECF Doc. 11 at p. 19).

Although the ALJ mis-stated the content of Dr. Konieczny's opinion relating to the domain of attending and completing tasks, it is not clear that an accurate recital of his opined limitations would lead to a finding of marked impairment in this domain, especially given the other evidence cited by the ALJ in support of her finding. Nevertheless, even if it did, remand of G.A.L.'s case on the basis of this issue would prove futile. It is well established that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) ((quotation marks and citation omitted)).

As explained *supra*, in order for a claimant under the age of 18 to functionally equal the listings and qualify for SSI, the claimant's impairment must result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). Here, even if the ALJ found Dr. Konieczny's opinion persuasive and determined that his statement that G.A.L. would have "sporadic and inconsistent…. difficulty maintaining focus on even simple multi-step tasks" during her PTSD flashbacks meant that she was markedly limited in that area - an outcome which is far from certain - it would not result in a finding of disability because the ALJ had not found a marked limitation in any other functional domain. Therefore, regardless of whether the ALJ erred in the analysis of Dr. Konieczny's opinion, remand would be futile.

## VI. Conclusion

---

[3] The Court notes it was omitted from Plaintiff's statement of the issues. (ECF Doc. 11 at p. 1).

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Dated: June 29, 2026

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE